FILED
2013 Sep-30  PM 03:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **JERRY RAY ALLEN,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Plaintiff**, | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO.** |
| | ) | **3:11-CV-04322-KOB** |
| | ) | |
| **MICHAEL ASTRUE** | ) | |
| **COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| | ) | |
| **Defendant**. | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On October 18, 2006, the claimant applied for a period of disability and disability insurance benefits under Title II and Part A of Title XVIII of the Social Security Act. (R. 77). The Commissioner denied these claims initially on February 6, 2007. (R. 31). On March 15, 2007, the Commissioner determined that the claimant's disability under Title XVI had ceased, as he no longer met the criteria for disability under § 12.05 of the listings, and terminated the claimant's eligibility as of May 31, 2007. (R. 32).[1] On March 20, 2007, the claimant filed a request for reconsideration of his disability cessation. (R. 43). The Commissioner again denied the claim on June 30, 2008. (R.

---

[1] On September 27, 1994, the Commissioner initially found the claimant disabled as of July1, 1994 and awarded him child's supplemental security benefits under Title XVI from that date until his March 1, 2007 determination.

54). The claimant timely filed a request for a hearing before an Administrative Law Judge, and the ALJ held the hearing on September 15, 2009. (R. 67).

In an opinion dated January 5, 2010, the ALJ found that the claimant's disability under § 1614(a)(3)(A) of the Social Security Act ended on March 1, 2007, and that the claimant had not become disabled again since that date; therefore, the ALJ found that the claimant was ineligible for both a period of disability and disability insurance benefits, as well as supplemental income. (R. 26). The Appeals Council subsequently denied the claimant's request for review on October 20, 2011, and the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 6). As the claimant has exhausted his administrative remedies, this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

Because the ALJ improperly evaluated the claimant's mental retardation and because the Appeals Council did not adequately consider new and material evidence, this court reverses the decision of the Commissioner and remands to the ALJ for further findings consistent with this opinion.

## II. ISSUES PRESENTED

The claimant raised several issues on appeal. Because the court finds the following issues determinative, it does not reach the other issues.

(1)    Whether the ALJ improperly evaluated the claimant's mental retardation under 20 C.F.R. § 404.1520a and section 12.05 of the listings.
(2)    Whether the Appeals Council inadequately considered new evidence in making its determination not to review the ALJ's decision.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the

factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. But this court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

This court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must look not only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take into account evidence that detracts from the evidence on which the ALJ relied. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration may terminate benefits if the claimant's medical condition has improved sufficiently since the initial disability determination, such that he is no longer disabled. *See* 20 C.F.R. § 404.1594(a)-(b). In a proceeding to determine whether a claimant's disability continues, the Commissioner must use the following multi-step sequential evaluation process:

(1)     Does the claimant have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1? If yes the claimant's disability continues. If no, the evaluation proceeds to step two.

(2)     Has the claimant experienced medical improvement? If yes, the evaluation proceeds to step three; if no, the evaluation proceeds to step four.

(3)     Is the claimant's medical improvement related to his ability to work? If yes, the evaluation proceeds to step five; if no, the evaluation proceeds to step four.

(4)     Does an exception apply under 20 C.F.R. §§ 416.994(b)(3)-(4)? If no exception applies, the claimant's disability continues. If an exception in (b)(3) applies, the evaluation proceeds to step five. If an exception in (b)(4) applies, the claimant is not disabled.

(5)     Does the claimant have a medically severe impairment or combination of impairments? If yes, the evaluation proceeds to step six; if no, the claimant is not disabled.

(6)     Is the claimant unable to perform his former occupation? If yes, the evaluation proceeds to step seven; if no, the claimant is not disabled.

(7)     Is the claimant unable to perform any other work within the national economy? If yes, the claimant is disabled; if no, the claimant is no longer disabled.

20 C.F.R. § 416.994(b)(5).

As to mental impairments, the ALJ must base his evaluation on the "special technique" dictated by the Psychiatric Review Technique Form (PRTF). *Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005); 20 C.F.R. § 404.1520a-(a). The "special technique" requires an evaluation of the impact of the claimant's mental impairment on (1) activities of daily living (ADLs); (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *Moore*, 405 F.3d at 1213. Failure to either complete the PRTF and append it to the ALJ's opinion, or to incorporate the PRTF's "mode of analysis" into the ALJ's decision constitutes reversible error. *Moore*, 405 F.3d at 1214.

Additionally, a finding of disability for mental retardation under the listings requires a finding that the claimant "(1) ha[s] significantly subaverage general intellectual functioning; (2) ha[s]

4

deficits in adaptive behavior; and (3) ha[s] manifested deficits in adaptive behavior before age 22."
*Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997); *see* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 § 12.05. A claimant's mental retardation is sufficiently severe when it meets the requirements of 12.05A, B, C, *or* D. Under 12.05C, a claimant must have a valid verbal, performance, or full scale IQ ranging from 60 to 70, and an additional mental or physical impairment imposing an additional work-related limitation on function. Under 12.05D, a claimant must have a valid verbal, performance, or full scale IQ ranging from 60 to 70, resulting in at least two of the following:

> (1) marked restriction of activities of daily living; or
> (2) marked difficulties in maintaining social functioning; or
> (3) marked difficulties in maintaining concentration, persistence, or pace; or
> (4) repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05D.

After an ALJ's determination, a claimant may present new and material evidence to the Appeals Council, and the Council must consider such evidence in determining whether to review the ALJ's decision. 20 C.F.R. §§ 404.967, 404.970(b); *Falge*, 150 F.3d at 1322-24. New evidence is material if a reasonable possibility exists that the new evidence would change the administrative result. *Id.* at 1323. When a claimant presents new evidence to the Appeals Council and it subsequently denies review of the ALJ's decision, the Appeals Council must show that it adequately evaluated the new evidence, and did not "perfunctorily adhere" to the ALJ's decision. *Epps v. Harris*, 624 F.2d, 1267, 1273 (5th Cir. 1980).[2] Where a reasonable possibility exists that new

---

[2]After the Fifth Circuit split and the Eleventh Circuit was established, the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down before the close of business on September 30, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

evidence could change the administrative result, the Appeals Council must not simply acknowledge the new evidence with no further mention or attempt to evaluate it. *See Flowers v. Comm'r of Soc. Sec.*, 441 Fed. Appx. 735, 745 (11th Cir. 2011).

## V. FACTS

The claimant was twenty-three years old at the time of the administrative hearing, and has an eighth grade special education. (R. 24). The claimant has past work experience as a plumber helper. (R. 504). The claimant alleged that he was disabled by mental retardation beginning on July 5, 1994. (R. 20, 74).

### *Background*

On September 27, 1994, the Disability Determination Service ("DDS") found the claimant had been disabled beginning July 1, 1994, with mental retardation as the primary diagnosis. (R. 27). On September 8, 2001, the DDS found that the claimant's disability continued, with a primary diagnosis of mental retardation and secondary diagnosis of Gastroesophageal Reflux Disease ("GERD"). (R. 29). On March 15, 2007, the DDS found that the claimant's disability had ceased as of March 1, 2007 and that his eligibility would terminated on May 31, 2007. (R. 32).

### *Mental Limitations*

On February 13, 1991, the claimant took a Wechsler Intelligence Scale For Children-Revised Test. The claimant achieved a Verbal IQ of 80, a Performance IQ of 85, and a Full Scale IQ of 81. (R. 115-117).[3]

---

[3] Because the ALJ relied on and discussed the claimant's IQ scores from 1991 through 2008, the court will discuss each of his IQ scores included in the record.

Throughout the 8th grade, the claimant participated in a multi-disciplinary eligibility determination test. On December 8, 1994, the claimant took a WISC-III intelligence test, scoring a 65 Verbal IQ, a 72 Performance IQ, and a 66 Full Scale IQ.  (R. 100-103).

On July 27, 1999, the claimant visited Dr. James E. Crowder, Ph.D., on referral from the DDS for a comprehensive psychological evaluation. Dr. Crowder administered the Wechsler Adult Intelligence Scale-III test, and found that the claimant had a Verbal IQ of 67 (1st percentile), a Performance IQ of 74 (4th percentile), and a Full Scale IQ of 67 (1st percentile). Dr. Crowder concluded that the claimant was mildly mentally retarded, but that he could function in an age appropriate manner socially, adaptively, behaviorally, and in concentration, persistence and pace. (R. 278-280).

On October 18, 2006, the claimant applied for a period of disability and disability insurance benefits as an adult under Title II and Part A of Title XVIII of the Social Security Act. (R. 77).[4]

On November 30, 2006, the claimant's mother completed a Report of Continuing Disability Interview. The claimant's mother stated that the claimant suffered from mental retardation and high blood pressure. She also stated that he could not follow directions and struggled to understand and carry-out simple tasks. Further, the claimant's mother stated that the claimant could not read. The claimant's mother noted that the claimant worked as a plumber helper from January 2004, until February 2005, when he was fired because he could not understand his assignments. (R. 187-196).

On December 1, 2006, the claimant's mother completed a Work Activity Report Interview.

---

[4] Unlike the three-step sequential analysis the Commissioner used to determine if the claimant was disabled as a child, the standard for determining whether the claimant continues in his disability as an adult involves the multi-step sequential evaluation process discussed in the Legal Standard section of this Memorandum Opinion.

The claimant's mother stated that he worked for his half-brother, but was released because he could not carry out instructions or purchase the correct parts or tools from a store. The interviewer, Yvonne Veal, noted that she did not consider the work to be substantial gainful activity, because the claimant's mother stated that he would not have been hired if his employer were not his half-brother. (R. 197-204).

On December 20, 2006, the claimant's mother submitted a DDS claim form. The claimant's mother wrote that the claimant's wife helped care for him and his children, and that the claimant was constantly depressed, often affecting his sleep. The claimant's mother further wrote that the claimant had poor short term memory and needed reminders to take his medication. She indicated that although the claimant shopped for food and personal items approximately twice a month, he required several hours to complete the shopping because he had to call home to be reminded what to buy. She further wrote that the claimant could not read or write and that he struggled with basic arithmetic. Also, she noted that the claimant was increasingly withdrawn, stayed to himself, and did not want to participate in social activities. (R. 205-211).

On January 31, 2007, Dr. David D. Powers, a clinical psychologist, evaluated the claimant's mental functional capacity. The examination took place at the request of the SSA to determine the claimant's eligibility for Title II and Title XVIII benefits. Dr. Powers found that the claimant was either moderately limited, or not significantly limited in all areas of the PRTF. Dr. Powers wrote that the moderate restrictions were "real" with no severe problems of any kind. Dr. Powers concluded that the claimant could perform simple work. (R. 305-322).

On February 6, 2007, Taminee Jones and Pamela Ellis, vocational examiners, performed a vocational analysis on the claimant. Ms. Jones and Ms. Ellis indicated that the claimant was

moderately limited in the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaption. The examiners found that, although the claimant's skills from past relevant work would not transfer because of his mental impairment, the claimant could adjust to other unskilled positions such as sandwich maker, dining room attendant, and baggage porter. (R. 212-215).

Thus, on February 6, 2007, Dr. Powers and Ms. Ellis indicated that they believed the claimant was not eligible for disability insurance benefits under Title II of the Social Security Act. Dr. Powers and Ms. Ellis listed the claimant's primary diagnosis as mental retardation, with a secondary diagnosis of hypertension. (R. 30).

On March 15, 2007, Dr. Powers and Melissa Woodward, a disability examiner for DDS, determined that the claimant was no longer disabled as of March 1, 2007. Dr. Powers and Ms. Woodward listed the claimant's primary diagnosis as mental retardation, with a secondary diagnosis of essential hypertension. Dr. Powers and Ms. Woodward noted that the claimant's benefits would cease after May 31, 2007. (R. 32).

On March 20, 2007, the claimant's mother filed a request for Reconsideration for Disability Cessation. The claimant's mother stated that the claimant had become more withdrawn and did not want to be around people. She also noted that the claimant had hypertension. (R. 104-110).

On April 2, 2008, the claimant, his brother, and his mother attended a disability hearing in Tupelo, Mississippi. In his hearing report, Anthony Gates, the hearing officer, noted that the claimant had problems reading and could not handle money. Mr. Gates further noted that the claimant had problems understanding and focusing, and problems with short term memory. Mr. Gates also wrote that the claimant worked for his brother for a year, but was let go because he took too long to learn

9

the job. Mr. Gates further noted that the claimant had problems with comprehension and was "slow to catch on." Mr. Gates then took the claimant's mother's statement, wherein she testified that the claimant was increasingly depressed; the claimant could not follow simple instructions; and he became frustrated easily. The claimant's brother then testified that the claimant could not understand his job, and that the claimant caused the brother to lose potential jobs and money because of his poor understanding of the position. (R. 217-228).

On June 30, 2008, Mr. Gates determined that the claimant's disability had ceased as of March 1, 2007, and affirmed the previous cessation determination. (R. 34).

On July 8, 2008, the claimant's mother completed a Disability Report Appeal form. The claimant's mother wrote that since the last disability report, the claimant suffered from an increase in back and neck pain, that his depression had worsened, and that he experienced more frequent gout flares. The claimant's mother further noted that the claimant was more withdrawn. (R. 229-236).

On September 25, 2008, the claimant visited Dr. Joe Edward Morris for a psychological evaluation. Dr. Morris stated that the claimant was "surly in many of his responses, very guarded and extremely vague," and that the claimant was "minimally cooperative." Dr. Morris speculated that the claimant was malingering. Dr. Morris stated that the claimant had a driver's license, which he obtained via a written test. Dr. Morris noted that the claimant seemed oriented, but became irritated during the examination. Dr. Morris further stated that the claimant sometimes had suicidal thoughts. He found that the claimant was disgruntled and seemed to over-dramatize his pain and felt that the claimant exhibited a marked tendency to give up easily. He administered a WAIS-III test, on which the claimant scored a 55 Verbal IQ, a 54 Performance IQ, and a 50 Full Scale IQ. Dr. Morris found the results of the test invalid, however, because he found the fact that the claimant obtained a driver's

license through a written test contradictory to his exhibited reading deficiency; Dr. Morris believed the claimant exhibited malingering; and he found many of the claimant's statements during the evaluation inconsistent, although Dr. Morris did not elaborate as to the exact nature of these inconsistencies. (R. 323-328).

*Physical Limitations*

On July 9, 1998, the claimant visited the Shoals Hospital in Muscle Shoals, Alabama, complaining of heartburn. The claimant stated that he had been taking Prilosec, but that it no longer helped. Dr. Darin K. Bowling, a doctor of osteopathic medicine, prescribed additional Prilosec and scheduled an upper GI series, to be performed on July 13. (R. 287).

On July 13, 1998, the claimant returned to the Hellen Keller Hospital, for an upper GI Series. Dr. Bowling performed the test. Dr. Bowling stated that oral administration of barium demonstrated a normal distention of the claimant's esophagus, without significant reflux. However, the claimant's duodenal bulb did demonstrate a mild increase in fold pattern, but he saw no evidence of ulcerations. Otherwise, Dr. Bowling found that this test reflected a normal GI series. (R. 267).

On January 8, 1999, the claimant reported to Hellen Keller Hospital for an Esophagogastroduodenoscopy. Dr. Bowling found that the claimant's GERD had not responded to Prilosec, and scheduled the procedure. Dr. Venkat Namburu performed the surgery, and gave the postoperative diagnosis of distal erosive esophagitis and hiatal hernia. After the procedure, Dr. Namburu increased the claimant's dose of Prilosec, prescribed Propulsid, and advised the claimant to lose some weight. (R. 269-270).

On November 22, 2000, the claimant returned to the Avalon Medical Center, complaining of worsening heartburn. The attending physician increased the claimant's dose of Prilosec. (R. 303).

On February 25, 2003, the claimant returned to the Avalon Medical Center, complaining of heartburn and acid reflux. The attending physician diagnosed the claimant with reflux and a hiatal hernia, and renewed the claimant's prescription for Prilosec. (R. 301).

On March 24, 2003, the claimant again visited the Avalon Medical Center, complaining of heartburn and reflux. The claimant's blood pressure was 140/96. The attending physician diagnosed the claimant with hypertension and GERD. The physician renewed the claimant's Prilosec. (R. 300).

On September 23, 2003, the claimant returned to the Avalon Medical Center for a follow up visit. The claimant complained of nose bleeds, reflux, headaches, and tingling in his hands. The claimant's blood pressure was 160/102. The attending physician prescribed Lotrel for the claimant's hypertension, and renewed the claimant's Prilosec. (R. 299).

The next documentation of treatment in the record reflects a uric acid lab from Helen Keller Hospital on September 13, 2005. The claimant had a high uric acid level at 9.7 mg/dL. (R. 298).

The claimant then returned to the Avalon Medical Center for a follow-up of his lab results on September 19, 2005. The claimant complained of gout. The claimant's blood pressure was 156/100, and the attending physician noted that the claimant was non-compliant with his hypertension medication, because he did not regularly take his medication. The physician also diagnosed the claimant with gout, and prescribed Decadron, Depomedrol, Avapro, and Indocin. (R. 297).

On February 5, 2008, the claimant visited Dr. Marilyn MacAnalley at the Care Plus Medical Clinic in Sheffield, Alabama. The claimant complained of gout and back pain, and also had high blood pressure (156/112). In addition, the claimant noted frequent and painful urination. Dr. MacAnnaley diagnosed the claimant with hypertension, a UTI, gout, and unspecified lower back

pain. Dr. MacAnalley treated the claimant with medication and ordered a uric acid lab. The claimant's uric acid lab revealed high levels of uric acid (9.4 mg/dL). The claimant was 5 feet, 9 inches tall, and weighed 274 pounds. (R. 340, 357).

On February 12, 2008, the claimant returned to the Care Plus Clinic for a follow-up visit on his UTI and hypertension. The claimant reported that he no longer suffered burning in urination, and his blood pressure had lowered to 128/87. Dr. MacAnalley renewed the claimant's blood pressure medication. The claimant weighed 274 pounds. (R. 339).

On March 25, 2008, the claimant returned to the Care Plus Clinic for a follow-up on his high blood pressure. The claimant reported that he had been out of his medication for one week, and his blood pressure was 140/90. Dr. MacAnalley renewed his prescription for blood pressure medication. The claimant weighed 274 pounds. (R. 338).

On July 8, 2008, the claimant sought treatment from the Care Plus Clinic for a knot that appeared on his neck two days prior. Dr. MacAnalley noted chronic back pain in addition to the pain and swelling associated with the knot, and prescribed Bactrim, Clindaymacin, and a topical steroid for the claimant's knot. The claimant weighed 265 pounds, and his blood pressure was 138/90. (R. 336).

On August 20, 2008, the claimant returned to the Care Plus Clinic seeking a refill of his blood pressure medication. The claimant's blood pressure was 150/100. Dr. MacAnalley diagnosed the claimant with hypertension, lower back pain, and thoracic back pain, and ordered an X-Ray of the claimant's thoracic and lumbar spine. The X-Ray revealed that the claimant had mild anterior wedging of the T10 and T11 vertebra, but no remarkable lumbar spine issues. The claimant weighed 269 pounds. (R. 335, 349).

On September 14, 2008, the claimant sought treatment from the Care Plus Clinic for gout pain in his right foot. Dr. MacAnalley diagnosed the claimant with gout and hypertension, and prescribed Indocin. The claimant weighed 264 pounds and his blood pressure was 120/94. (R. 334).

The claimant returned to the Care Plus Clinic on October 31, 2008, seeking treatment for back and neck pain.  Dr. MacAnalley then ordered an X-Ray of the claimant's cervical spine. The X-Ray revealed no remarkable problems. The Technologist, Gwendolyn Harbin, stated that the claimant needed an MRI. The claimant weighed 268 pounds and his blood pressure was 120/88 (R. 333, 344).

On January 21, 2009, the claimant sought treatment from the Care Plus Clinic, complaining of shortness of breach, chest pain, chills, sore throat, and heartburn. The claimant also ran out of his blood pressure medication, and had a blood pressure of 140/115. Dr. MacAnalley sent the claimant to the emergency room[5] because of the chest pain, shortness of breath, and hypertension. The claimant weighed 272 pounds and his blood pressure was 140/115. (R. 331).

The claimant returned to the Care Plus Clinic for a follow-up visit on March 30, 2009. Dr. MacAnalley noted that the claimant ran out of blood pressure medicine, and that the claimant's blood pressure was 136/92. Dr. MacAnalley diagnosed the claimant with GERD, chronic neck and back pain, anxiety, and hypertension. She prescribed the claimant Zantac, stopped the claimant's Zoloft prescription, and prescribed Celexa to treat the claimant's anxiety. The claimant weighed 272 pounds and his blood pressure was 136/92. (R. 330).

On April 14, 2009, Dr. MacAnalley discontinued the claimant's Celexa for anxiety, and replaced it with Lexapro, an anti-depressant. The record does not contain a notation of an office

---

[5]No record of this emergency room visit exists in the record.

visited associated with this prescription change. (R. 475).

The claimant again visited the Care Plus Clinic on June 2, 2009, for a follow up visit for GERD. Dr. MacAnalley diagnosed the claimant with GERD, and chronic neck and back pain, and stated that the claimant needed Medicaid approval for an MRI. The claimant weighed 235 pounds and his blood pressure was 130/84. (R. 384).

The claimant had a follow-up visit with the Care Plus Clinic on July 22, 2009, where Dr. MacAnalley stated that the claimant needed blood work and a prescription refill for blood pressure medicine. Dr. MacAnalley diagnosed the claimant with hypertension, anxiety, and chronic back and neck pain. Dr. MacAnalley also scheduled an MRI for the claimant on July 31, 2008. The claimant weighed 240 pounds and his blood pressure was 136/72. (R. 383).

On July 31, 2008, the claimant had an MRI on his cervical and lumbar spine. Technologist Melissa Bergmann performed the MRI, which revealed disc protrusion into the left lateral recess and neural foraminal region, with some associated end plate spurring identified at the C6-7 disc interspace level. The MRI also revealed degenerative desication of the L4-5 and L5-S1 discs. The MRI revealed an otherwise normal lumbar spine, with no significant nerve root compression at L5. (R. 359).

Dr. MacAnalley also referred the claimant to Dr. Gregory Adderholt, a neurosurgeon, whom the claimant initially visited on August 31, 2009. Dr. Adderholt found the claimant's physical examination largely normal, noting motor skills of 5/5, reflexes of 2+ and equal, and normal sensation, gait, and station. Dr. Adderholt did note, however, that claimant exhibited a positive Phalen's sign on the right. Dr. Adderholt concluded that the claimant's back and neck pain were likely degenerative in origin, and that the claimant also probably had carpal tunnel syndrome.

Additionally, Dr. Adderholt scheduled a Nerve Conduction Velocity (NCV) in both of the claimant's upper extremities, and recommended anti-inflammatories, weight loss, and exercise for the claimant's back pain. (R. 364- 365).

On September 2, 2009, the claimant returned to Dr. Adderholt for a follow-up visit after his NCV. Dr. Adderholt stated that the claimant had paresthesias and numbness in his hands, and that the NCV revealed bilateral carpal tunnel syndrome. Dr. Adderholt stated that he would treat the claimant with splinting and anti-inflammatories, and if unsuccessful after two weeks, carpal tunnel release. (R. 363).

On September 16, 2009, the claimant returned to Dr. Adderholt for a follow-up visit on his carpal tunnel syndrome. Dr. Adderholt stated that the claimant experienced worsening symptoms of paresthesias and numbness, despite Dr. Adderholt's conservative measures. Dr. Adderholt offered the claimant a left carpal tunnel release (as Dr. Adderholt noted the left was the more symptomatic side). Dr. Adderholt stated that the claimant understood the risks and benefits of such a procedure including worsening weakness, numbness, pain, and neuroma formation, and desired to proceed with surgery. Dr. Adderholt noted that he would arrange the surgery and see the claimant for a follow-up after the procedure. (R. 362).

On September 18, 2009, the claimant returned to Dr. MacAnalley at the Care Plus Clinic for a checkup and prescription refill. Dr. MacAnalley diagnosed the claimant with chronic neck and back pain, hypertension, and anxiety, and renewed the claimant's prescriptions. The claimant weighed 240 pounds and his blood pressure was 122/86. (R. 469).

On September 23, 2009, the claimant visited Dr. MacAnalley for a follow-up, also seeking treatment for ear aches, body aches, and fever. Dr. MacAnalley diagnosed the claimant with the flu,

and also noted the claimant's anxiety. The claimant did not present with hypertension, however, as his blood pressure was 120/72. The claimant weighed 240 pounds. (R. 382).

On October 15, 2009, the claimant reported to Dr. Adderholt for a preoperative physical examination and for surgery. Dr Adderholt stated that the claimant experienced paresthesias and numbness in both hands (worse in the left), that tended to wake him during the night. Dr. Adderholt further noted that the claimant's symptoms had not improved with the usual conservative measures. Dr. Adderholt stated that the claimant had notable medical history of hypertension, and that the claimant smoked a pack of cigarets per day. Dr. Adderholt then performed a left carpal tunnel release. Dr. Adderholt noted no complications during the procedure. (R. 445-448).

The claimant returned to Dr. Adderholt for a follow-up on October 28, 2009. Dr. Adderholt stated that the claimant was "doing exceptionally well" and that he had complete resolution of the paresthesias, but still experienced some residual pain in his ring finger. Dr. Adderholt advised the claimant to resume his normal activities in two weeks, after the wound had fully healed. Dr. Adderholt also noted that the claimant's right carpal tunnel had not improved with conservative treatment, and that the claimant desired to have surgery on the right as well. (R. 436).

On November 12, 2009, the claimant reported to Dr. Adderholt for surgery on the right hand. Dr. Adderholt reported the same history as the previous procedure, noting that the claimant achieved good results with his left carpal tunnel release. Dr. Adderholt then performed a right carpal tunnel release, noting no complications and stating that the claimant was stable after surgery. (R. 441-444).

The claimant returned for a follow-up visit on November 23, 2009. Dr. Adderholt stated that the claimant presented with no carpal tunnel-related complaints, but that the claimant had low back, hip, and leg pain. Dr. Adderholt noted that the claimant had degenerative disc disease, and that he

17

had treated the claimant conservatively in the past. Dr. Adderholt prescribed Cataflam, and administered a shot of DepoMedrol. (R. 435).

On December 29, 2009, the claimant visited Dr. MacAnalley at the Care Plus Clinic for a checkup. The claimant presented with high blood pressure (128/106), and Dr. MacAnalley noted that the claimant had run out of his medication. Dr. MacAnalley diagnosed the claimant with hypertension, hyperlipidemia, and back pain/arthritis. Dr. MacAnalley renewed the claimant's prescriptions. The claimant weighed 270 pounds. (R. 468).

On January 19, 2010, the claimant visited a new doctor, Dr. Brad Ginevan, in Tuscumbia, Alabama. Dr. Ginevan stated that the claimant had histories of chronic anxiety, depression, GERD, gout, and hypertension that the claimant well-controlled, and chronic hyperlipidemia that the claimant had not well-controlled. Dr. Ginevan stated that the claimant complained of moderate back pain, localized to the bilateral lower lumbar spine, and that the claimant had suffered from the symptoms for several years. The claimant stated that his back medication was not controlling his pain. The claimant also stated that he experienced moderate joint pain, localized in the feet bilaterally, and lasting for several years. The claimant indicated that he was unsuccessfully treating the condition with gout medication and that he wanted preventative medication. The claimant also complained of anxiety and depression, but stated that he was forced to medicate with samples from past doctors, as his insurance did not cover his prescription for depression. Dr. Ginevan stated that the claimant needed an anti-depressant that Medicaid would cover. The claimant weighed 272 pounds. Dr. Ginevan diagnosed the claimant with gouty arthropathy, hypertension, atypical depressive disorder, and esophageal reflux. Dr. Ginevan renewed the claimant's prescriptions. (R. 452-455).

On February 2, 2010, the claimant returned to Dr. Ginevan for a follow-up visit. The claimant reported high blood pressure (137/86), acid reflux, back and joint pain, anxiety, and depression. The claimant stated that he stopped taking his anti-depressant because it caused blurred vision and nausea. The claimant weighed 272 pounds. Dr. Ginevan diagnosed the claimant with gouty arthropathy, hypertension, atypical depressive disorder, and esophageal reflux. Dr. Ginevan adjusted the claimant's anti-depressant prescription and renewed the claimant's other prescriptions. (R. 457-460).

The claimant visited Dr. Ginevan again on February 16, 2010, for a follow-up visit. The claimant presented with high blood pressure (132/84), acid reflux, back and joint pain, anxiety, and depression. The claimant weighed 269 pounds. The claimant stated that his depression had improved somewhat since his last visit. Dr. Ginevan diagnosed the claimant with esophageal reflux, hypertension, atypical depressive disorder, and gouty arthropathy. Dr. Ginevan increased the claimant's pain medication, stating that the claimant needed an appointment for pain control. (R. 461-464).

On April 27, 2010, the claimant underwent an X-Ray of his lumbar spine at the direction of Dr. Adderholt. The X-Ray indicated mild narrowing of the disc interspace at the L5-S1 level, but an otherwise normal lumber spine. (R. 440).

On April 29, 2010, the claimant visited Dr. Adderholt for a follow-up after the claimant's X-Ray. Dr. Adderholt stated that while the X-Ray revealed no nerve root compression, the claimant may have experienced pain resulting from ulnar nerve compression at the elbow. Dr. Adderholt scheduled a diagnostic nerve test. (R. 434).

19

*The ALJ Hearing*

On March 15, 2007, the Commissioner determined that the claimant's disability under Title XVI had ceased and terminated the claimant's eligibility as of May 31, 2007. (R. 32). On March 20, 2007, the claimant filed a request for reconsideration of his disability cessation. (R. 43). The Commissioner again denied the claim on June 30, 2008. (R. 54). The claimant timely filed a request for a hearing before an Administrative Law Judge, and the ALJ held the hearing on September 15, 2009. (R. 67). The claimant, the claimant's mother, and Thomas Elliot, a vocational expert, attended the hearing.

The ALJ first noted that the claimant was not represented by counsel at the hearing and clarified that the claimant had waived his right to representation on the record. Next, the ALJ discussed the claimant's pending carpal tunnel surgery with the claimant's mother. The claimant's mother stated that the surgery would be scheduled the following day. (R. 486-490).

The ALJ then questioned the claimant about his carpal tunnel. The claimant stated that he experienced pain and tingling, worse at night, that occasionally woke him from sleep. The claimant also stated that the carpal tunnel was in both hands, but presently worse in the right hand. The claimant stated that he had experienced the carpal tunnel pains for approximately three months and that he had problems grasping things. The claimant further testified that sometimes he dropped things because of the pain in his hands. (R. 490-491).

The ALJ then asked the claimant about other physical problems. The claimant stated that he had gout in both feet, and that he purchased a walking stick from a pharmacy to aid him in ambulating during episodes of gout, approximately twice a month. The claimant also stated that he took gout medication as prescribed by Dr. MacAnalley. (R. 492-493).

20

The claimant next described his back problems. The claimant stated that his back hurt constantly. The ALJ, referring to the claimant's MRI, characterized the claimant's back pain as degenerative disc disease. The claimant's mother then testified that Dr. Adderholt informed her that no surgery was possible for the claimant's back pain and that he simply had to live with the pain and treat it symptomatically. (R. 493-494).

The claimant's mother then explained to the ALJ that the claimant was taking anti-depressants and that he recently locked himself in his trailer and refused to talk to anyone. The claimant's mother also stated that the claimant had suicidal thoughts and sometimes talked about killing himself. The ALJ asked the claimant how long he had been married, but the claimant did not know. The claimant stated that he had three children, and that his wife was unemployed. The claimant then testified that he had a driver's license, but that he seldom drove. The claimant clarified that the driver's license examiner read the test to him aloud. The claimant also noted that he mostly watched television during the day, and that he could not read. (R. 494-499).

The ALJ then questioned the claimant about his employment. The claimant stated that he was unemployed and never seriously attempted to find work. The claimant's mother clarified that he previously worked for his brother, but was fired because he caused the company to lose money, and that he struggled in understanding and retaining instructions. The claimant's mother also testified that the claimant's wife was limited in her ability to work, because she had a newborn baby and could not leave the child with the claimant because of his depression. (R. 500-503).

The ALJ then examined the vocational expert, Thomas Elliott. Mr. Elliott classified the claimant's previous work as plumber helper, a construction-based job that was heavy-exertional level, semi-skilled work. The ALJ asked Mr. Elliott if a hypothetical individual who could only

perform unskilled work, without other restrictions, would face significant limitations on the individual's ability to work. Mr. Elliott testified that thousands of unskilled jobs were available in the national economy. Mr. Elliott then gave examples of machine packer, hardware assembler, and production machine tender—all medium-exertion, unskilled work. Mr. Elliott stated that approximately 4,000 or greater of each job existed in the regional economy, and that greater than 500,000 jobs each existed in the national economy. (R. 504-507).

The ALJ next asked Mr. Elliott if the same hypothetical individual were restricted to only occasional interaction with supervisors, co-workers, and the general public, would there be significant restrictions on the availability of those jobs. Mr. Elliott testified that such a restriction would not seriously limit the jobs he previously discussed. (R. 507).

Then, the ALJ asked Mr. Elliott about the effects of carpal tunnel syndrome on unskilled jobs. The ALJ asked if the same hypothetical individual were restricted to only occasional use of his hands, could he sustain gainful employment in the national economy. Mr. Elliott testified that such a restriction precluded gainful employment. The ALJ then asked the same question about an individual limited to only frequent use of his hands, and Mr. Elliott stated that such a restriction would allow the hypothetical individual to find light or sedentary work. (R. 508).

The ALJ next asked Mr. Elliott if the same hypothetical individual had back pain that limited him to only light work, could the individual find gainful employment in the national economy. Mr. Elliott described the jobs of assembler of small parts, sub-assembler of electronic components, and nut and bolt assembler as illustrative unskilled, light jobs. Mr. Elliott testified that approximately 2,500 of each of these jobs existed in the regional economy, and greater than 200,000 each existed in the national economy. When the ALJ asked if such an individual could perform these jobs when

22

limited to only occasional use of his hands, Mr. Elliott stated that such an individual could not sustain gainful employment with those restrictions. (R. 509-510).

The ALJ finally asked Mr. Elliott about a hypothetical individual who had mental problems that affected his ability to persist and concentrate for longer than two hours. Mr. Elliott stated that "an inability to sustain persistence, concentration, or pace for up to two hours . . . would preclude the ability to sustain these examples or any other example of unskilled work." (R. 510).

*The ALJ Decision*

The ALJ rendered his decision on January 5, 2010, finding the claimant was not disabled under § 1614(a)(3)(A) of the Social Security Act, and that his disability had ended on March 1, 2007. The ALJ began his decision by describing the multi-step evaluation process of determining whether a person's disability continues. The ALJ proceeded to his findings of fact and conclusions of law. First, the ALJ noted that the claimant's most recent favorable medical decision finding that the claimant continued to be disabled, or the "comparison point decision" (CPD), was on September 8, 2001. (R. 18-19).

Next, the ALJ found that at the time of the CPD, the claimant had the medically determinable impairments of mental retardation and GERD. The ALJ found that these impairments met § 12.05C of the listings. Then, the ALJ found that as of March 1, 2007, the claimant had the medically determinable impairment of mental retardation, and no other impairment or combination of impairments that met or medically equaled the listings. (R. 19-20).

Discussing the claimant's alleged impairments, the ALJ began with the claimant's mental retardation. The ALJ first recounted the claimant's various intelligence tests on the record. The ALJ noted the following tests: a 1994 test that indicated a verbal IQ of 65, a performance IQ of 72, and

a full scale IQ of 66; a July 27, 1999 test, that revealed a verbal IQ of 67, a performance IQ of 74, and a full scale IQ of 67; and the test given by Dr. Morris on September 25, 2008, that showed a verbal IQ of 55, a performance IQ of 54, and a full scale IQ of 50.  The ALJ noted that the scores were invalid because Dr. Morris felt that the claimant was intentionally evasive, vague, and malingering. The ALJ also made note of Dr. Morris's contention that the claimant exhibited "histrionic flare" and seemed to "over-dramatize his pain." Further, the ALJ found the claimant's statement at the hearing that a driver's license examiner read the written test to him inconsistent with Dr. Morris's statement that the claimant took the written test. (R. 20, 22).

The ALJ also discussed a 1991 intelligence test that revealed a verbal IQ of 80, a performance IQ of 85, and a full scale IQ of 81. The ALJ stated that this score, coupled with Dr. Morris's findings, indicated that the claimant was capable of receiving simple instructions, performing routine repetitive tasks, responding to supervision, and interacting cooperatively with others. The ALJ further found that the claimant's employment as a plumber helper, an activity the ALJ considered both substantial and gainful, coupled with the results of the 1991 intelligence test and Dr. Morris's findings, indicated that the claimant possessed higher intellectual abilities. The ALJ then stated, however, that he would give the claimant the benefit of the doubt, and adopted Dr. Crowder's findings that the claimant possessed an IQ between 60 and 70. (R. 21).

Then, the ALJ found that the claimant did not have other physical or mental impairments that imposed additional and significant work related limitations necessary to establish disability under section 12.05C of the listings. The ALJ listed the claimant's carpal tunnel, gout, back pain, depression, and obesity, before discussing each in turn. (R. 21).

First, the ALJ discussed the claimant's carpal tunnel. The ALJ acknowledged that Dr.

24

Adderholt diagnosed the claimant with bilateral carpel tunnel syndrome in September 2009. However, because the ALJ received no evidence of treatment after September 16, 2009, the ALJ found that no evidence existed in the record to indicate that the claimant's carpel tunnel would impose any limitations for a period of twelve continuous months from onset. (R. 22).

Next, the ALJ discussed the claimant's back pain. The ALJ first noted that the claimant's initial complaint of lower back pain came in February 2008, after the claimant's disability cessation but before the reconsideration determination. Then, the ALJ noted that, although the claimant's MRI indicated some disc dessication, Dr. Adderholt's examination revealed fairly normal strength, range of motion, reflexes, gait, and station. The ALJ found this assessment in accord with Dr. Morris's findings concerning malingering. The ALJ also noted that Dr. Adderholt gave the claimant back exercises and advised him to lose weight. Finally, the ALJ stated that the record did "not show that the claimant has had persistent back pain over a 12 month period despite treatment." Thus, the ALJ found that the claimant's back pain was not a "severe" impairment. *Id*.

Then, the ALJ discussed the claimant's gout. The ALJ found that the claimant only sought treatment for gout in February, September and October 2008, which was inconsistent with the claimant's complaints of gout flares 1-2 times per month at the hearing. Further, although the record indicated that the claimant was obese, the ALJ did not elaborate on the claimant's obesity, because "the claimant did not testify that he has any problems or limitations related to his obesity." Similarly, the ALJ stated that the record did not reflect any treatment or complaints of depression; thus, depression was not a medically determinable impairment. (R. 23).

After discussing the claimant's alleged impairments, the ALJ proceeded to determine whether the claimant had medically improved as of March 1, 2007. The ALJ found that because the claimant

met the requirements of § 12.05C at the time of his CPD, but no longer met the criteria of the listings, the claimant had medically improved as of March 1, 2007. The ALJ further found that the claimant's improvement was related to his ability to work. *Id*.

The ALJ then sought to determine the claimant's Residual Functional Capacity (RFC), finding that the claimant had the severe impairment of mental retardation, limiting the claimant to unskilled work. The ALJ stated that the claimant had the RFC to perform unskilled work at all exertional levels. The ALJ noted that the claimant had "no physical impairments which restrict his ability to perform the exertional requirements of work." The ALJ stated that he did not find the claimant's testimony credible "in view of the paucity of medical treatment and essentially normal findings on examination as well as the obvious malingering and attempts at secondary gain noted by Dr. Morris." (R. 23-24).

Because the claimant's past work as a plumber helper was semi-skilled work, the ALJ found that the claimant could not perform his past relevant work. The ALJ further found that the claimant had a limited education and could communicate in English. The ALJ also noted that the transferability of the claimant's job skills was not material to the determination of disability, as the Medical-Vocational Rules supported a finding that the claimant was not disabled. Finally, the ALJ determined that based on the claimant's RFC, the claimant could perform the jobs of machine packager, hardware assembler, production machine tender, sub-assembler of electronic parts, and nut and bolt assembler, all of which existed in significant numbers in the national economy. (R. 24-25).

Therefore, the ALJ found that the claimant's disability ended on March 1, 2007, and the claimant had not become disabled again since that date. (R. 25). The ALJ evaluated all the evidence

in the administrative record up to September 23, 2009.

The claimant submitted evidence dated from October 15, 2009, to the Appeals Council, and the Appeals Council considered the evidence in its determination not to review the ALJ's decision.

## VI. DISCUSSION

### 1. Evaluation of the Claimant's Mental Impairment

The court considers whether the ALJ properly evaluated the claimant's mental impairment under 20 C.F.R. § 404.1520a, and § 12.05 of the listings. The court finds that the ALJ erred in his evaluation of the claimant's mental impairment.

The ALJ must base his evaluation of mental impairments on the "special technique" dictated by the PRTF. *Moore*, 405 F.3d at 1213; 20 C.F.R. § 404.1520a-(a). The "special technique" requires an evaluation of the impact of the claimant's mental impairment on (1) activities of daily living (ADLs); (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *Moore*, 405 F.3d at 1213. Failure to either complete the PRTF and append it to the ALJ's opinion, or to incorporate the PRTF's "mode of analysis" into the ALJ's determination constitutes reversible error. *Id*. at 1214.

Additionally, a finding of disability for mental retardation under the listings requires a finding that the claimant must "(1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." *Crayton*, 120 F.3d at 1219; *see* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 § 12.05. A claimant's mental retardation is sufficiently severe when it meets the requirements of § 12.05A, B, C, or D. Under § 12.05C, a claimant must have a valid verbal, performance, or full scale IQ ranging from 60 to 70, and an additional mental or physical impairment imposing a work-related limitation on

27

function. Under § 12.05D, a claimant must have a valid verbal, performance, or full scale IQ ranging from 60 to 70, resulting in at least two of the following:

> (1) marked restriction of activities of daily living; or
> (2) marked difficulties in maintaining social functioning; or
> (3) marked difficulties in maintaining concentration, persistence, or pace; or
> (4) repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05D.

In this case, the ALJ made no mention of the PRTF, or any "special technique" required in the evaluation of mental impairments. Further, the ALJ did not attach a PRTF to his opinion, nor did his mode of analysis reflect that of the PRTF. The ALJ noted the claimant's history of intelligence tests, including a 1994 test resulting in scores of 65, 72, and 66; and a 1999 test resulting in scores of 67, 74, and 67. The ALJ then described in detail the test administered by Dr. Morris in 2008 that revealed scores of 55, 54, and 50, noting Dr. Morris's finding in 2008 that the results were invalid because of the claimant's perceived malingering.

The ALJ then noted a 1991 test administered at the claimant's school that revealed scores of 80, 85, and 81, stating that those scores supported Dr. Morris's finding that the claimant "is capable of performing unskilled work" and "can handle simple instructions, perform routine repetitive tasks, respond to supervision, and interact cooperatively with others." The ALJ further stated that the claimant's work as a plumber helper represented substantial gainful activity, even though the claimant's mother testified that the claimant only was hired because his brother ran the business, and Yvonne Veal, a DDS worker, found in 2006 that the claimant's work was not substantial gainful activity.

The ALJ made no determination about the claimant's ability to perform ADLs; his social functioning; his concentration, persistence, and pace; or any periods of decompensation. Thus, the

ALJ committed reversible error because he neither attached a PRTF to the opinion, nor followed its mode of analysis in his evaluation of the claimant's mental retardation.

Further, the ALJ improperly confined his analysis to § 12.05C of the listings. Section 12.05 states that the claimant's impairment is severe if it meets the requirements of § 12.05A, B, C, or D. Section 12.05D allows for a finding of disability if the claimant has an IQ between 60 and 70, and has marked restrictions with two of the four areas outlined in the PRTF. The ALJ made no findings associated with § 12.05D.

Therefore, the court finds that the ALJ committed reversible error in neither attaching the PRTF to his opinion, nor incorporating its mode of analysis in his evaluation of the claimant's mental retardation. The ALJ also erred in his failure to evaluate the claimant's mental retardation under § 12.05D.

### 2. Appeals Council Consideration of New Evidence

Finally, the court considers whether the Appeals Council properly considered the new evidence the claimant submitted after the ALJ's decision. The court finds that the ALJ did not adequately consider new and material evidence in making its determination not to review the ALJ's decision.

A claimant may present new and material evidence to the Appeals Council, and the Council must consider such evidence in determining whether to review the ALJ's decision. 20 C.F.R. §§ 404.967, 404.970(b); *Falge*, 150 F.3d at 1322-24. New evidence is material if a reasonable possibility exists that the new evidence would change the administrative result. *Id.* at 1323. When a claimant presents new evidence to the Appeals Council and the Appeals Council subsequently denies review of the ALJ's decision, the Appeals Council must show that it adequately evaluated the

new evidence, and did not only "perfunctorily adhere" to the ALJ's decision. *Epps*, 624 F.2d at 1273. Where a reasonable possibility exists that the new evidence could change the administrative result, the Appeals Council must not simply acknowledge the new evidence with no further mention or attempt to evaluate it. *See Flowers*, 441 Fed. Appx. at 745.

After the ALJ found the claimant not disabled on January 5, 2010, the claimant filed a request for review of the ALJ's decision with the Appeals Council, and submitted five new exhibits. The evidence included treatment records from Dr. Adderholt from October 28, 2009, through April 29, 2010; Dr. MacAnalley from February 5, 2008, through December 29, 2009; and Dr. Ginevan from January 19, 2010, through March 15, 2010. The new evidence included treatment for carpal tunnel, back and neck pain, and depression.

Considering that the ALJ based his decision that the claimant had no other severe impairments than mental retardation primarily on the paucity of evidence of treatment of other impairments, such evidence creates a reasonable possibility of a different administrative result. Although the Appeals Council stated that it considered the evidence, it simply issued a form denial. It merely acknowledged the evidence, giving no further explanation as to why it did not believe that the new evidence was material. The Appeals Council did not list specific, adequate reasons why it believed the new evidence from the claimant's treating physicians could not possibly change the administrative result.

Therefore, because this court finds that the new evidence submitted to the Appeals Council created a reasonable possibility of a different administrative result, the Appeals Council did not adequately consider the new and material evidence, and erred in not remanding the case to the ALJ.

*Additional Concerns*

The court also has concerns about whether the ALJ improperly considered the claimant's obesity in combination with his other impairments and whether he properly applied the Eleventh Circuit's pain standard in evaluating the claimant's subjection claims regarding his limitations. The court instructs the ALJ to adequately address both of the court's concerns on remand.

## VII. CONCLUSION

For the reasons stated, this court finds that the Commissioner did not employ the correct legal standards in making his determination. Accordingly, substantial evidence does not support his decision. Therefore, the court will REVERSE and REMAND the decision of the Commissioner to the ALJ for further action consistent with this opinion. The court simultaneously will enter a separate Order to that effect.

DONE and ORDERED this 30th day of September, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE